UNITED STATES OF AMERICA
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

ABDI NUR SALAH,

Defendant.

Case No. 22-cr-00223 (6) (NEB)

**DEFENDANT ABDI NUR SALAH'S POSITION WITH RESPECT TO SENTENCING**

Defendant Abdi Nur Salah, by and through his undersigned counsel, Brian Toder, having concurrently moved the Court for a sentencing Order reflecting a sentence below the advisory Guidelines range found in the Revised Presentence Investigation Report ("PSR") (Dkt. 1054), offers the following.

<u>Surviving Objections to the PSR</u>

Both Mr. Salah and counsel for the government disagree with the PSR's application and calculations respecting the sentencing guidelines. The Plea Agreement (Dkt. 497) presents a base offense level of seven, increased by 16 levels based on a loss of more than $1.5 million dollars and increased by two levels because the offense involved fraud in connection with a major

disaster or emergency benefits. Most importantly, the parties agreed that Mr. Salah was a minimal, not a minor, participant deserving of a four-level reduction. Reducing his base offense level by application of his acceptance of responsibility and further reducing it because he is a zero-point offender, his total base offense level is 16. The parties anticipated a guidelines range of 21-27 months of imprisonment.

The PSR came up with a different set of numbers. It removed the four-point reduction for Mr. Salah's minimal role in the offense and replaced it with only a two-level reduction, taking the position that Mr. Salah's role was a minor one. It then added two levels, mistakenly believing that Mr. Salah made a misrepresentation that he was acting on behalf of charitable , political organization, or government agency. "Given the defendant's misrepresentations, a 2-level enhancement applies." (PSR at ¶ 107.) No such misrepresentation by Mr. Salah is identified in the PSR, nor in the several terabytes of government disclosures nor in any of the trials the Court has had the benefit of. Most importantly, there is no evidence, nor could there

be, that Mr. Salah had any knowledge of the fraud when he facilitated the ownership of Stigma-Free to Ahmed Artan and his associates.[1]

The PSR's final calculation produced a total offense level of 20, a criminal history category of I and a guidelines range of 33-41 months. (PSR at ¶ 154.)

Counsel for the government addressed this most succinctly in their May 28, 2026 letter, filed under seal, stating their objection to the PSR applying a 2-level increase pursuant to Guidelines §2B1.1(b)(9)(A). (regarding Mr. Salah's alleged misrepresentations) (Dkt. 897) and their belief that, based on the totality of the circumstances, Mr. Salah was a minimal participant in the offense conduct. (*Id.*) Counsel for the government concluded by asking the Court to consider the total offense-level and Guidelines range anticipated by the parties in the plea agreement. (*Id.*) And so does the undersigned.

---

[1]The Plea Agreement on page 2 recites, "From in or about April 2020 through in or about January 2022, the defendant knowingly participated in a scheme to defraud . . . ." This language appears because it is taken from the Indictment's count that Mr. Salah pled to, "From on or at least in or about April 2020 through in or about January 2022, in the State and District of Minnesota, and elsewhere the defendants [plural] . . . did knowingly devise and participate in a scheme to defraud . . . ." (Indictment at ¶ 144.) The dates define the life of the entire scheme. Mr. Salah knowingly participated in helping those defendants who defrauded the federal child nutrition program, but Mr. Salah's knowledge of the fraud occurred well after he located Stigma-Free and facilitated its transfer from Jamal Osmon to Ahmed Artan.

In its comments to Mr. Salah's objections regarding the PSR's view of Mr. Salah's involvement with Stigma-Free (PSR at p. A.3), the PSR relies on Mr. Salah's agreeing with government counsel when asked if he "located a nonprofit entity called Stigma Free International for use in carrying out the scheme." (COP hrg. Tr. 31; 7-12). Of course he did, and of course he facilitated the transfer to Ahmed Artan and his associates who most certainly carried out the scheme using that non-profit entity. But Mr. Salah up to that point had no involvement with the entity or knowledge of the intentions of his co-defendants and the fraud. Certainly not in October of 2020. If he had, it is unlikely the government would have agreed to his having a minimal role in the offense.

Most importantly, Mr. Salah never *acquired* Stigma-Free, and he never claimed he was acting on behalf of an organization contemplated in USSG §2B1.1(b)(9)(A). Ahmed Artan told him that he needed a non-profit because of new rules regarding his business. Mr. Salah knew that Jamal Osman had Stigma-Free which was dormant. He facilitated the transfer, and that was all he ever had to do with Stigma-Free. It was as simple as that. Later, however, he was assimilated into the fraud, and for that he fully accepts his responsibility.

Interestingly, nowhere in the Plea Agreement, nor in the change-of-plea hearing transcript, is there any mention of the government's assertion "that the defendant utilized his position as a senior policy aide for the mayor of Minneapolis to lobby politicians to pressure the Minnesota Department of Education in refraining from shutting down Feeding Our Future sites . . . ." (PSR at p. A.4.) It did not happen, and neither did he receive compensation for such . . . ." (*Id*.)

Mr. Salah, a Somali, was a trusted advisor to the Mayor. The City of Minneapolis enjoys a large Somali population. When the Mayor's constituents expressed concerns about the food distribution stations being shut down (not all of them were fraudulent operations), the Mayor directed Mr. Salah to listen to their concerns and report back to him. That was the extent of "lobbying" any "politicians." The only "compensation" Mr. Salah got from that assignment was his regular paycheck from City Hall.

Specifically, the Court is respectfully requested to:

**¶ 55.** Strike all references to Mr. Salah in ¶ 55. The footnote does not fix the problem. Adding a "in such a manner" transparently negates any notion of a denial. Mr. Salah had no involvement with any politicians regarding

Feeding Our Future, and saying that Mr. Salah was a "sponsored site operator" simply ignores what happened in real life.

**¶ 66.** "acquired" was clarified at the change-of-plea hearing to mean "located." (COP hrg. Tr. 31; 7-12.) More accurately, Mr. Salah located the entity and facilitated the transfer to others who then opened Stigma-free sites.

¶ 73. Mr. Salah created Optimum Community Services, but had nothing to do with its operations. There is no evidence that he claimed to have served any meals at the Optimum Community Services sites.

**¶ 99.** References to Mr. Salah should be stricken from this paragraph. He did not open or operate any sites. How could he "knowingly *allow*" anyone to do anything. He did not have a role that permitted him to manage, supervise or direct anyone to do anything. He laundered money. He dealt with the co-conspirators, and he was not acting on behalf of anyone other than himself. He did not misrepresent anything to the people he dealt with.

**¶ 107.** As noted *supra*, this paragraph should be stricken in its entirety.

**¶¶ 104-117; 153-154.** These paragraphs should be edited to conform to the Guidelines calculations agreed upon by government counsel, the undersigned and Mr. Salah as memorialized in the Plea Agreement.

## Legal Framework

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). There is no presumption that a sentence within the Guidelines is reasonable. *United States v. Henson*, 550 F.3d 739,740 (8th Cir. 2008) (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)); *Nelson v. United States*, 55 U.S. 350, 129 S. Ct. 890, 892 (2009).

"[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50; 18 U.S.C. § 3553(a).

## Offense Conduct

Having now had the benefit of trials, pleas and other proceedings involving 14 individuals in this case and 25 individuals in related cases, the Court is likely well-acquainted with the operation of the fraud which spanned several years, April of 2020 through January of 2022, and caused a loss to the Federal Child Nutrition Program of almost a quarter of a billion dollars. (PSR at ¶ 34.)

By September of 2020, Ahmed Artan and his associates believed that the Minnesota Department of Education ("MDE") was going to bar for-profit organizations like his from participating in the Federal Child Nutrition Program that was funded by the United States Department of Agriculture ("USDA"). Artan needed a non-profit. He contacted an individual who had a reputation for getting things done, Mr. Salah.

Mr. Salah was very helpful, He knew of a non-profit that was alive on paper but was not engaged in any activity, Stigma-Free International which was controlled by Jamal Osman who also worked for the City.

Mr. Salah, the young man who could get things done, tackled the paperwork, and Mr. Artan became the president of Stigma-Free International. The following month, October of 2020, Artan and his associates opened at least five Stigma-Free sites. (PSR at ¶ 65.)

Also in October of 2020, Artan and Abdikadir Mohamud enrolled a site under the sponsorship of Feeding Our Future, called Stigma-Free Willmar. Then Mohamud created Tunyar Trading LLC, ostensibly to be a vendor at the Stigma-Free Willmar site. (PSR at ¶ 66.) A month later he engaged Mr. Salah as a consultant with the understanding that Mr. Salah was to receive 30% of Tunyar Trading's gross profit as his compensation.

The compensation paid to Mr. Salah began in March of 2021 and ended in December of that year. Nine checks totaling approximately $913, 254 were paid to Mr. Salah through his new company, Stone Bridge Development, LLC.

Mr. Salah had never had any involvement with feeding or not feeding people. He had nothing to do with false claims. He was never a sponsor of a site. He was not involved with bribes or kickbacks. He never misrepresented anything to anyone, but he was far from innocent. When huge checks came his way, it started with willful blindness, but soon enough he knew the truth.

Mr. Salah continued to be the guy who could get things done, most notably forming LLC's for the purpose of purchasing real estate with funds derived from the fraud, such as ANS Projects LLC, and Five A's Projects LLC. And he created Optimum Community Services for Artan, but he had no interest in it.

On September 13, 2022, Mr. Salah was indicted. The 61-count Indictment charges him with three counts of wire fraud and one count of money laundering. On January 28, 2025 Mr. Salah pled guilty to one count of wire fraud, and the other three counts were dismissed.

In pleading, Mr. Salah agreed to restitution in the amount of $1,063,255. Notably, $343,418. was seized from his account at Star Credit Union, at least one of his properties has been or is about to be sold. This is brought to the Court's attention to highlight that the fact that his personal gain number in the fraud will ultimately be considerably attenuated.

Criminal History

Mr. Salah has no criminal history and is a zero-point offender.

Personal History[2]

Abdi Nur Salah was born in Mogadishu, Somalia in 1987. He is 38 years old. His parents were not together, and he never had a relationship with his biological father. When Abdi was ten years old his mother acquired a significant other, a schoolteacher. They have had, and continue to have, a loving relationship.

---

[2] What follows is a faithful paraphrasing of Offender Characteristics found in the PSR at ¶¶ 126-149 and from the undersigned's interviews of Mr. Salah.

In 1993, young Abdi, his four siblings and parents migrated to the United States as refugees and settled in Minnesota, specifically the Phillips neighborhood in South Minneapolis where there was a steady presence of violence drugs and crime, but Mr. Salah kept his distance from that culture thanks to his mother who prioritized education and structure within his day-to-day living.

In 2008, Mr. Salah married his childhood sweetheart, and they had three children. Seven years later they divorced. The following year he remarried and had another child. Four years later they divorced, and he found the love of his life, Khadra. They have three children together and plan to marry.

Mr. Salah did well for himself in his new country. After graduating from High School, he obtained a degree in finance from Metro State University and a Masters Degree in Business Administration from Texas A&M. Presently he is a Phd. candidate, studying at Hamline University.

From 2017 until March of 2022, Mr. Salah was a senior policy advisor to the Mayor of Minneapolis. Given his stature in the Somali community and ability to speak Somali, Swahili and Arabic languages, he was a tremendous asset to City government.

From 2010 to December of 2021, he kept himself busy serving on several boards and commissions such as the Confederation of Somali Community; Corridor Management Committee, Nice Ride Minnesota; Achieve Minneapolis; Minneapolis Action Plan Policy Group; Generation Next; and the Minneapolis Racial Equity Committee.

And then came Covid. And then came the Indictment, and gone was his job at the Mayor's office, and gone was every shred of respect he previously earned in the Somali Community.

The PSR at paragraph 148 briefly talks about his writing, The Warsangalu Sultanate Law, Land and Resistance in the Horn of Africa. A copy is provided to the Court and counsel for the government as Exhibit A to the concurrently filed Declaration of Brian Toder. (Dkt. 1059.) It is a masterful read, and it is hoped that it will someday define him, more so than the matter at bar.

Paragraph 148 of the PSR also talks about his video channel. The Court is respectfully requested to view one of his videos, *Black Gold, Broken Promises: How Somalia's Oil Was Signed Away.*[3] This can be found at

https://www.youtube.com/watch?v=5dBw094yaWU&t=98s

[3] "Abdulqudus Donyale" is Mr. Salah's *nom de plume*.

In his own words:
I'm the sole producer of @Arkhivum, an independent YouTube channel little over a year old. inspired by preteens who thought others might put up with my storytelling (my kids). Since, I've created 100 short/long-form investigative documentaries, each focused on history, geopolitics, and the voices too often left out of mainstream narratives. These aren't mass-produced stories—they are handcrafted essays in visual form. Every aspect—research, scripting, narration, editing, sound design—is created by me. And on many late nights, I've had the quiet help of my 12-year-old daughter, Safwa. She's been my most honest critic and most sincere motivator—fact-checking maps, previewing rough edits, and reminding me who we do this work for.

My latest film, "Somalia's Silent Base," is a prime example. It uncovers a hidden military installation on Somali soil and examines the wider implications of foreign presence, resource extraction, and silence. It's not just an exposé—it's a mirror. You can view it here:
Somalia's Silent Base | Arkhivum

Arkhivum was never about chasing numbers. It was about telling the truth well—and giving history back to those who were written out of it. We now have over 1,100 subscribers, nearly 100,000 views, and a growing community of people hungry for substance over spectacle.
If this documentary is shown to the sentencing judge, I hope it reflects more than just the quality of my work—I hope it reveals the character behind it. A person who values integrity. Who puts in the hours. Who believes that art, when grounded in truth, can still make a difference.

Thank you again, Brian—for your encouragement, your advocacy.
With deep respect,
Abdi Salah
Creator of Arkhivum
YouTube.com/@Arkhivum

## Just Punishment

His punishment has been, and continues to be well underway. He was on the top of the world, a respected community leader, working directly with the mayor. And then his world morphed into something ugly. Money does that to some people.

The respect he enjoyed vanished. The Somali community is composed of wonderful, hard-working, patriotic new citizens, and Minnesota has been enriched by their presence. That public perception of that community took a turn for the worse because of the actions of the conspirators, including Mr. Salah. His contribution to the fraud was too often in the news. He became a recluse who medicated himself with his writing and video productions, hoping to do something for his community and some day be forgiven. But he was not forgiven, and even unknown to his significant other, he began medicating himself with drugs.

He violated his pretrial release by failing to timely report two encounters with law enforcement. On July 11, 2026, in Hennepin County, he was arrested on a charge of 3rd Degree DWI, refusing to test. (27-cr-26-17888) (PSR at ¶ 124.) On August 16, 2026, in Hennepin County, he was arrested on a charge of 5th Degree possession of a controlled substance (1.5 grams, field tested for fentanyl). (27-cr-26-21406 ) (PSR at ¶ 125.) Those cases are active and pending, and he will face the consequences of those charges in Minnesota state court. Hopefully, a migration to drug court and treatment. One of the consequences he is already facing. On September 9,

2026, the Honorable Shannon G. Elkins ordered home detention as an additional condition of pretrial release.

Proposed Sentence

Mr. Salah asks for time-served coupled with home detention for the federal conviction and for the pretrial release violations. The Court has the discretion to sentence to home detention. Federal law permits a court to impose home detention as a condition of supervised release (18 U.S.C. § 3583) based on § 3553(a)(1) factors. 18 U.S.C. § 3583(c). This dovetails with Guidelines provision §5F1.2 ("Home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment.")

This sentence is sufficient, given the mitigating factors the record reveals. Mr. Salah has had his freedom constrained for four years. During this time he could not make serious plans for his and his family's future. Being on home detention with the ability to work a day job and at the same time continue his valuable video and historical work will rehabilitate him and benefit his community if he is also permitted to do community service. It will also facilitate his paying restitution. His cooperation regarding the liquidation of the seized properties will be very helpful to the government.

Further in mitigation, he has seven young children who would benefit from his being able to work. Still further in mitigation is the role he played which the government agrees was minimal.

## CONCLUSION

Given the foregoing, the Court should find that incarceration in a federal prison is "greater than necessary" and is not "just punishment" within the meaning of 18 U.S.C. § 3553(a). A sentence of time-served coupled with home detention will "promote respect for the law." (*Id*.)

Respectfully submitted,

**CHESTNUT CAMBRONNE PA**

Dated: September 23, 2026

By /s/ Brian N. Toder
Brian N. Toder, #017869X
100 Washington Avenue South
Suite 1700
Minneapolis, MN 55401
Tel (612) 339-7300
Fax (612) 336-2940
btoder@chestnutcambronne.com