UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 22-223(3) (NEB/DTS)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SALIM AHMED SAID,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **GOVERNMENT'S POSITION REGARDING SENTENCING** |

The United States of America, by and through its attorneys, Daniel N. Rosen, United States Attorney for the District of Minnesota, and Rebecca E. Kline and Matthew C. Murphy, Assistant United States Attorneys, submits the following sentencing memorandum and respectfully requests that the Court impose a sentence of 40 years in prison.

## I. BACKGROUND

On March 19, 2025, a federal jury found Salim Said guilty of orchestrating a massive fraud scheme— one of unprecedented scale in this country. aid was a central organizer of what became the largest COVID-19 fraud scheme in the United States. The scope of the scheme and the consequences of his actions are profound, with lasting implications for Minnesota and the nation. The brazenness of his and his co-defendants' conduct have deeply affected Minnesota and reverberated across the country, inflicting lasting harm and further eroding public trust in programs created to assist those in need.

The consequences extend far beyond the immediate financial losses, which themselves are significant—over $44 million dollars intended to feed children in need, pocketed by greedy fraudsters. This case has permanently changed the landscape of fraud enforcement and will shape how government assistance programs are administered, monitored, and scrutinized for years to come.

The Court must send a clear and unequivocal message to Said, and to anyone who might believe they can exploit state and federal safety net programs, that such conduct will be met with the strongest possible consequences. Stealing funds intended to feed children is a profound breach of trust that demands accountability.

### A. Salim Said's Involvement at Safari Restaurant

Salim Said deliberately weaponized a federal safety net designed to feed hungry children during one of the most vulnerable crises in modern history. Instead of nourishing a community in need, he hijacked the program to systematically enrich himself, his company, and his co-conspirators. He traded the well-being of underserved children for a life of unvarnished luxury, diverting millions in public funds to acquire a million-dollar residence, a gilded mansion on Park Avenue in Minneapolis, a fleet of high-end vehicles, and a lifestyle of extravagant monthly shopping sprees.

Salim Said did not merely participate in this scheme; he was its undisputed architect, actively recruiting others to expand its reach and multiply the number of fraudulent food distribution sites. In April 2020, Said enrolled Safari Restaurant, a small south Minneapolis restaurant, in the Federal Child Nutrition Program under the sponsorship of Feeding Our Future. Almost immediately, Said and his co-

conspirators began siphoning millions of dollars out of the program, dollars intended to feed needy children. Yet, the profits he gained through a single restaurant could not satisfy his desire. Driven by unchecked greed, Said chose to go further. As FBI Special Agent Travis Wilmer testified at trial, Said "franchised" the fraud, exploiting the Federal Child Nutrition Program as a scalable business model, systematically duplicating the deception across a wider network.

While his recruited co-conspirators bear full legal responsibility for their actions and have and will continue to face this Court's accountability, the reality is that Said himself built, oversaw, and provided the infrastructure by which each of his co-conspirators were drawn into the fraud. He provided the blueprint and the opportunity for others, who similarly went on to abuse a vital public safety net to fund their lavish lifestyles. Multiple cooperating witnesses who participated in the fraud themselves testified about their deep regret that they were drawn in to this scheme.

While many companies were struggling to stay afloat, amidst the stay-at-home orders and social distancing, Said aggressively pursued the enrollment of new and additional food sites, each intended to defraud the Federal Child Nutrition Program. By doing so, he pursued the maximum inflated meal counts, meaning maximum pay outs. Within months, Said was making millions, all at the expense of a taxpayer funded program. Ultimately, Said's expansion served a unitary purpose: self-enrichment. His company, Salim Limited, took a cut of the fraudulent funds that many of his co-conspirators themselves derived from the conspiracy.

Said also partnered with Aimee Bock, the executive director of Feeding Our Future, to perpetuate the scheme to defraud the Federal Child Nutrition Program. Bock maintained complete administrative and financial control over Feeding Our Future and managed the influx of millions of federal reimbursement dollars pouring into the organization's bank accounts. She alone controlled the financial pipeline, ensuring that Said consistently received consecutive, million-dollar payout checks over and over again, totaling over $47 million. *See, e.g.*, Gov't Ex. W-1, W-2.


4962
FEEDING OUR FUTURE
3055 OLD HWY 8, SUITE 312
MINNEAPOLIS, MN 55418
BANK OF AMERICA
ACH R/T 071214579
74-1457/712
12/29/2020
PAY TO THE ORDER OF Safari / Cosmopolitan Business Solution LLC
$ **1,065,055.36
One million sixty-five thousand fifty-five and 36/100****** DOLLARS
Safari
310 4th Avenue South
Minneapolis, Minnesota 55408
USA
MEMO Nov. 2020

*Example check from Feeding Our Future to Salim Said*

For 21 consecutive months, Said made thousands of fraudulent reimbursement claims, day after day, month after month. Each submission represented meals purportedly provided to underprivileged children, yet the listed children themselves were entirely fictitious. However, the taxpayer money funneled into the defendant's bank accounts was undeniably real. The trial record conclusively demonstrated the sheer impossibility of the defendant's claims. While Said's submitted claims for reimbursement boasted a ridiculous daily distribution of 6,000 meals, FBI pole

cameras placed at Safari Restaurant and other sites revealed that, on average, a mere 40 individuals stopped by the site each day to collect food. The defendant and his sites did not serve thousands of children; he served a calculated, lucrative lie.

### B. Salim Said Expanded The Fraud Through a Non-Profit

Salim Said expanded his fraudulent operations by diverting a non-profit, Stigma-Free International, as a conduit for multiple fake food distribution sites across greater Minnesota. Stigma Free International purported to operate food sites in places like Willmar, St. Cloud, and Mankato. Places where he thought no one would be looking too closely. Acting as an approved sponsor under Feeding Our Future, Stigma-Free International also claimed to feed thousands of children daily, submitting completely fabricated attendance rosters, fake invoices, and fake meal counts. Said also positioned Safari Restaurant, as the designated food vendor for these fake sites, enabling him to submit even more millions of dollars in exaggerated invoices for meals that were never served. This allowed Said and his co-conspirators to siphon an additional $10 million in Federal Child Nutrition Program funds. Once again, Said laundered these funds to finance his lavish lifestyle.

### C. Salim Said Paid Kickbacks in The Pay to Play Scheme

The testimony and evidence at trial showed that Salim Said further corrupted the Federal Child Nutrition Program through his participation in a pay to play scheme. Said paid Feeding Our Future employees an "entry fee" in the form of kickbacks. He participated in a sham transaction by which Aimee Bock was paid $310,000 for the "purchase" of a nonexistent daycare center. That nonexistent

daycare center was then used as a fraudulent food site by Said and his co-conspirators, effectively securing another pipeline for the fraud.

Said also paid a steady stream of illegal kickbacks to Feeding Our Future insider Abdikerm Eidleh in order to get his empire of fake meal sites up and running. In the 21-month period, Said paid over $61,000 in kickbacks to Eidleh through Cosmopolitan Business Solutions, and $49,000 in kickbacks to Eidleh through Salim Limited. This was a necessary friction-reducer to keep the fraud machine running—in exchange for the payments, Eidleh rubber-stamped each of Said's fraudulent invoices and fabricated meal counts, pushing them through to Bock and onward to MDE for reimbursement.

**D. Said Laundered Millions of Fraud Proceeds**

Finally, Said laundered millions of fraud proceeds obtained through the Federal Child Nutrition Program through a network of sham entities and bank accounts. However, the testimony and evidence at trial systematically dismantled his efforts to obfuscate where the money really went. The FBI's forensic accountants testified at trial to the extensive tracing efforts undertaken by law enforcement to locate and identify the sources and uses of Said's ill-gotten gains. Said not only methodically layered and routed his fraud proceeds through a web of bank accounts, but also used his fraud proceeds to purchase high-value homes and cars. He also embarked on luxury shopping sprees, during which he squandered taxpayer funds on high-end designer clothing, Rolexes, and expensive colognes.





*Vehicle Purchases by Salim Said*




*Mansion Purchase*




*Salim Said Residence Purchase*

Said treated a pandemic-era emergency relief lifeline as his personal piggy bank. Prior to the pandemic, Said reported a modest income of just $30,000 per year. Then, he suddenly transformed himself into a multimillionaire tycoon—purchasing a sprawling $1.2 million luxury estate in Plymouth complete with an indoor basketball court, snapping up commercial real estate on Park Avenue, and acquiring a fleet of high-end vehicles including a Mercedes-Benz and a custom $87,000 Chevrolet Silverado.

**E. Salim Said Lied to the Jury**

At trial, Salim Said chose to take the witness stand. During his testimony, he did not merely exercise his right to mount a defense. He actively attempted to subvert the truth-seeking function of the justice system. As the court heard and observed, his testimony in open court was full of bare-bones lies. He fabricated a narrative for his

role in the Federal Child Nutrition Program that was structurally impossible and utterly detached from reality. He even went as far as to testify that he had million-dollar contracts with food vendors, another obvious falsity. Said brazenly asserted that his modest restaurant was somehow preparing and served thousands of meals per day to towns several hours away and that his kickback payments to Abdikerm Eidleh were legitimate expenditures. By all accounts, the defendant treated the witness stand as yet another platform for deception.

## II. The Guidelines Range

Said raised various objections about the Guidelines range applicable to his case. However, the government agrees with the PSR's conclusions about all of the applicable Guidelines calculations, including the loss amount.

The base offense level for Count Group A is 7 pursuant to Guidelines § 2B1.1(a)(1). PSR ¶99. The base offense level is increased by 22 levels pursuant to Guidelines § 2B1.1(1)(L) because the loss was more than $25 million but less than $65 million. PSR ¶100. The government's position is that the entire loss of $44 million that the conspirators connected to Safari Restaurant obtained from the Federal Child Nutrition Program should be part of the loss. The testimony at trial established that Said jointly undertook this vast conspiracy to defraud the food program with his co-conspirators. It also established that he was a leader in this conspiracy in many ways. He was a principal of Safari Restaurant, created and opened his own fraudulent food sites, and was highly involved in the creation of all of the conspirators' respective entities and fraudulent food sites. Accordingly, Said is

responsible for all fraudulent claims submitted on behalf of all the sites involved in the conspiracy.

The offense level is increased an additional 2 levels pursuant to Guidelines §2B1.1(b)(9)(A) because the offense involved a misrepresentation that Said was acting on behalf of a charitable or educational organization. PSR ¶101. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(10) because the offense involved sophisticated means. PSR ¶102. The offense level is increased 2 levels pursuant to Guidelines § 2B1.1(b)(12) because the offense involved conduct described in 18 U.S.C. § 1040 (Fraud in Connection with a Major Disaster or Emergency Benefits). PSR ¶103. The offense level for Group A is increased by 3 levels because Said was a manager or supervisor of criminal activity involving five or more participants under Guidelines § 3B1.1(B). PSR ¶ 104.

The base offense level for Count Group B is 35, on account of the calculations under Group A for wire fraud resulting in an offense level of 35. PSR ¶ 108. The offense level is increased by 2 levels because Said was convicted under 18 U.S.C. § 1956. PSR ¶ 109. The offense level is increased by a further 2 levels because the offense involved sophisticated laundering pursuant to U.S.S.G. §2S1.1(b)(3). PSR ¶ 110. The offense level for Group B is also increased by 3 levels for Said's manager/ supervisor role under Guidelines § 3B1.1(B). PSR ¶ 112.

The greatest of the adjusted offense levels is 42. PSR ¶ 115. With a Criminal History of II, Said's Guidelines range is 360 months to life. PSR ¶ 166.

## III. Government's Sentencing Recommendation

### A. Nature and Circumstances of the Offense

Said participated in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest COVID-19 fraud scheme in the country. He took advantage of a once-in-a-century global pandemic to enrich himself. In doing so, he abused the generosity of Minnesotans and the state's substantial social safety net, a system designed to ensure that no child goes without food.

Said's Safari Restaurant served as the largest phony food site. He and his co-conspirators were at the center of the fraud scheme, acting as the scheme's power players and enabling significant amounts of taxpayer funds intended to feed children to be diverted. He used the money for personal enrichment, including luxury vehicles, homes, and other lavish spending.

### B. History and Characteristics of the Defendant

Said's history and characteristics reveal a harsh start to life. He fled Somalia with his family at age 3. At age 16, he came to the United States with his siblings, where he was abandoned by his parents. He moved between Minneapolis and Indiana until 2015, when he came back to Minneapolis for good. In 2015, he opened Safari Restaurant, which he operated until the instant offense. Said attended school through the 11th grade. He has two cultural wives and three minor children.

Said has a 2011 criminal conviction for forgery and fraud in the State of Indiana. In that case, he also took the stand at trial and lay the blame at the feet of others.

C. **The Need for Deterrence and to Protect the Public**

Said was a significant participant in one of the largest fraud schemes in the history of the District of Minnesota, and the single largest COVID-19 fraud scheme in the country. But Said didn't just take advantage of the COVID-19 pandemic to enrich himself and his co-conspirators. He took advantage of our state's compassion and its efforts to ensure no child went hungry. Make no mistake, Said's fraud has done great damage to the state. It has eroded trust in the government and raised questions about the sustainability of the state's system of social services. His crime undermined and endangered legitimate nonprofit organizations that rely on donations and taxpayers' funds to carry out necessary and important charitable work. To this day, Said has denied responsibility for his crimes. He has not expressed an ounce of remorse for his actions. He appears to have felt no shame. Cases like this are difficult to investigate and prosecute, which results in the widely held belief that perpetrators routinely get away with these crimes. The Court must send a message that fraud schemes like this are not worth it and will be met with severe sanctions.

Protection of the public is also paramount. The defendant's conduct was not impulsive. It was sustained, organized, and defended aggressively. Even under oath, facing overwhelming evidence, he chose dishonesty over responsibility. That speaks directly to his risk of reoffending and his respect for the rule of law.

Taking into consideration the Sentencing Guidelines, as well as all of the other factors required to be considered under § 3553(a), the government respectfully suggests that a sentence of 40 years in prison appropriately reflects the seriousness of Said's crimes, promotes respect for the law, provides a just punishment, and

creates adequate deterrence not only to Said, but to all other individuals who take advantage of the state and believe that they are above the law.

## IV. CONCLUSION

For the reasons stated above, the government respectfully requests that the Court impose upon Salim Said a sentence of 40 years in prison.

Dated: September 24, 2026

Respectfully Submitted,

DANIEL N. ROSEN
United States Attorney

*/s/ Rebecca E. Kline*
BY: REBECCA E. KLINE
MATTHEW C. MURPHY
Assistant U.S. Attorneys